IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **KIMBERLY M.**[1], ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | Civil Action No. 7:21cv00633 |
| ) | |
| **KILOLO KIJAKAZI,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Plaintiff Kimberly M. ("Kimberly") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for Supplemental Security Income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. § 1381-1383f. Kimberly alleges that the Administrative Law Judge ("ALJ") erred by failing to properly weigh the opinions of her primary care provider and her counselor and failing to properly determine her RFC.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 18) and **DENYING** Kimberly's Motion for Summary Judgment (Dkt. 16).

## STANDARD OF REVIEW

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Kimberly failed to demonstrate that she was

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Kimberly filed for SSI in August 2019, claiming her disability began on October 11, 2018, due to difficulty standing and sitting for long periods of time, panic attacks, anxiety, depression, a desire not to leave her home, numbness in her legs, hands, and arms, disc issues in her back, and knee issues. R. 101–02, R. 239. The state agency denied Kimberly's applications at the initial and reconsideration levels of administrative review. R. 101–13, 115–27. On March 18,

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2021, ALJ Joseph Scruton held a hearing to consider Kimberly's claims for SSI. R. 42–74. Counsel represented Kimberly at the hearing, which included testimony from vocational expert Mark Hileman. On April 27, 2021, the ALJ entered his decision analyzing Kimberly's claims under the familiar five-step process[3] and denying her claim for benefits.[4] R. 19–34.

The ALJ found that Kimberly suffered from the severe impairments of generalized osteoarthritis, particularly in the knees and hips; lumbar and cervical degenerative disc disease; type II diabetes; obesity; asthma; major depressive disorder; generalized anxiety disorder; and non-definitively diagnosed fibromyalgia. R. 22. The ALJ found that, regarding mental impairments, Kimberly's depression and anxiety were non-severe. R. 23–24. The ALJ found Kimberly was moderately limited in the broad functional areas of understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. R. 24.

The ALJ determined that Kimberly's mental and physical impairments, either individually or in combination, did not meet or medically equal a listed impairment. Id. The ALJ specifically considered listing 1.18 (abnormality of a major joint), listing 1.15 (compromise of a nerve root), listing 1.16 (cauda equina compromise), Social Security Ruling ("SSR") 14-2p

---

[3] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[4] Kimberly was 39 years old on her alleged onset date, making her a younger person under the Act. R. 33.

(diabetes mellitus), listing 11.14 (peripheral neuropathy), SSR 19-2p (obesity), listing 3.03 (asthma), and SSR 12-2p (fibromyalgia).

The ALJ concluded that Kimberly retained the residual functional capacity ("RFC") to perform sedentary work. R. 25. Kimberly can never use foot controls, kneel, crawl, climb, or crouch. Id. Kimberly can frequently, but not constantly, reach, handle, and finger bilaterally. Id. Kimberly can have no exposure to respiratory irritants and should have no public interaction requirements. Id. Kimberly's concentration, persistence, and maintaining pace is adequate for simple, routine tasks with environments of routine work situations and changes. Id. Kimberly can have occasional interaction with co-workers and requires an ordinary level of supervision. Id. Kimberly requires breaks at regularly scheduled two-hour intervals and will miss one day of work a month. Id. The ALJ determined that Kimberly was unable to perform her past relevant work as a fast-food sandwich maker or a cook helper but could perform jobs that exist in significant numbers in the national economy, such as addresser, touch-up screener, and final assembler. R. 33. Thus, the ALJ determined that Kimberly was not disabled. R. 34. Kimberly appealed the ALJ's decision, and the Appeals Council denied her request for review on October 21, 2021. R. 1–3.

## **ANALYSIS**

Kimberly alleges that the ALJ's RFC is not supported by substantial evidence because the ALJ failed to properly weigh the opinions of her primary care physician and counselor and failed to use a function-by-function analysis.

A. **Medical History Overview**

1. <u>Medical Treatment</u>

Kimberly has a history of obesity, back, knee, hip, and hand pain, edema, arthritis, neuropathy, and asthma. During the relevant period, Kimberly saw several healthcare providers, including her primary care provider, Richard Card II, D.O. Kimberly often complained to her providers of pain and tenderness in her back, knees, hips, and hands. R. 334, 386, 398, 419, 438, 458–59, 483, 599, 719. To help with her pain, doctors gave Kimberly injections, used osteopathic manipulation techniques, and prescribed physical therapy. 399, 402, 406, 439, 459, 600–01, 719–20, 903. Kimberly also presented with edema at several visits with her providers. R. 468, 483. Kimberly was instructed to wear compression stockings and to take medication, which helped with the swelling. 483, 485–86.

In August 2019, an MRI of Kimberly's spine showed several findings, including mild central canal stenosis and lumbar spine degenerative changes. R. 388–89. In January 2020, an MRI of Kimberly's knee showed a tear of the meniscus and significant wear and tear changes. R. 438. In March 2020, Kimberly received a right knee medial and lateral meniscectomy. R. 441. Kimberly reported popping after her surgery and continued to experience pain. R. 476–77. Providers discussed with Kimberly how her obesity was not good for her knees and that she would need to lose weight before she could have another knee surgery. R. 476–77, 719, 729. In March 2021, imaging of Kimberly's hips showed mild degenerative changes and no acute findings. R. 912.

At some examinations, Kimberly retained normal strength in her extremities, had a steady gait, and was reported as doing fair. R. 417, 470–71, 473–74, 479–80, 482–83, 719–20, 725–26,

900. At other examinations, Kimberly had an abnormal or antalgic gait or was treated for lumbar and lower extremity pain. R. 398–99, 405–06, 482–83, 734, 816, 865.

Kimberly was prescribed physical therapy on August 19, 2019, and January 14, 2020. R 399, 406. On February 17, 2020, Kimberly's orthopedist noted that Kimberly had "lost the note for physical therapy" and had not completed physical therapy as instructed. R. 438. On October 14, 2020, Kimberly was again referred to physical therapy. R. 720. From January 2021 and March 2021, Kimberly reported that physical therapy helped her pain. R. 815, 889. She also reported that her pain and numbness worsened when she did not do physical therapy. R. 889.

Kimberly also has a history of social anxiety and depression. During the relevant period, Kimberly primarily saw her counselor, Christina Watty, LCSW, and complained of anxiety, depression, and isolation. R. 372, 528. Kimberly reported experiencing panic attacks when she attempted to leave her house. R. 528. At some visits, Kimberly was guarded and had rapid or pressured speech, racing thoughts, and tangential speech. R. 363, 369, 516, 531, 561. Ms. Watty's treatment records indicate that Kimberly had no illogical thinking, delusions, or panic attacks during sessions, and that Kimberly repeatedly denied suicidal or homicidal ideations. R. 508, 531, 621, 703, 825. Throughout treatment, Ms. Watty reported that Kimberly demonstrated motivation to achieve her goals of increasing her mental stability and managing her emotions. R. 546, 564, 580, 654, 685, 834, 847.

2. Medical Opinions

In October 2019 and May 2020, respectively, state agency physicians Robert McGuffin, M.D., and Jack Hutcheson, M.D., reviewed the record and found Kimberly capable of a light exertional level, with four hours of standing and/or walking. R. 101–13, 115–28. The ALJ found these opinions not persuasive. R. 31. The ALJ stated that the state agency physicians "noted

[Kimberly] had internal derangement of the knee but received knee surgery in March 2020, and she reported doing better soon after." Id. The ALJ noted that later in the record, however, Kimberly "reported continued pain, and imaging showed substantial degeneration." Id. The ALJ reasoned that the pain and degeneration "indicates her standing/walking would be limited to the sedentary level." Id.

On January 25, 2021, Kimberly's primary care provider, Dr. Card, stated that Kimberly could sit less than two hours and stand/walk for less than two hours in an eight-hour day. R. 855. Dr. Card further concluded that Kimberly could lift/carry ten pounds. Id. Dr. Card stated that Kimberly's pain would frequently interfere with her attention and concentration and that she would miss work more than four times a month as a result of her impairments or treatment. Id. The ALJ found these opinions not persuasive. The ALJ reasoned that treatment notes do not show reduced strength or "indicate intense, chronic pain" R. 31. The ALJ also noted that although Kimberly has multiple medical conditions, "the record does not indicate she would miss much work if that work was limited in exertion." Id.

State agency physicians Dr. McGuffin and Dr. Hutcheson also found that Kimberly's depression and anxiety were non-severe impairments. R. 107, 122. The ALJ found these opinions not persuasive. R. 32. Although the state agency physicians reasoned that Kimberly's mental issues were not debilitating because her "primary care provider records show normal psychological findings", the ALJ concluded that Kimberly had "significant finds in some mental health visits, including racing thoughts and pressured speech" which "indicates she would have significant concentration difficulty with complex work." Id.

On October 3, 2018, Ms. Watty gave Kimberly marked limitations in social functioning and concentration, persistence, or pace. R. 452–53. Ms. Watty stated Kimberly had extreme

7

limitations in performing at a consistent pace, dealing with the stress of semiskilled and skilled work, and interacting with the public. Id. Ms. Watty concluded that Kimberly would miss more than four days a month of work. Id. On March 11, 2021, Ms. Watty gave a similar assessment, but gave Kimberly extreme limitations in social functioning and concentration, persistence, or pace. R. 895–96. The ALJ found these opinions not persuasive. R. 32. The ALJ reasoned that "Ms. Watty's great limitations are not supported by her records and they are not consistent with the other records, particularly the primary care provider records." Id.

    3.  Prior Decision

In August 2018, Kimberly received a decision on a prior application for a period of disability, Disability Insurance Benefits ("DIB"), and SSI. R. 78–95. In that decision, the ALJ concluded that Kimberly retained the RFC to perform light work with some limitations for her mental impairments. R. 86. The ALJ in this case gave the August 2018 decision limited weight. R. 32. The ALJ reasoned that the evidence indicates that Kimberly's "physical issues and resulting exertional ability have worsened" due to "substantial degeneration with the right knee" and "diabetes with peripheral neuropathy and some edema[.]" Id.

**B.  Medical Opinion Evidence**

Kimberly argues that the ALJ erred in his consideration of Dr. Card's opinion and should not have rejected Dr. Card's conclusions about Kimberly's ability to work. Specifically, Kimberly argues that the ALJ failed to consider evidence in the record consistent with Dr. Card's opinions, including records showing musculoskeletal abnormalities, knee pain, swelling, nerve pain, and back pain, even with a steady gait. Pl.'s Br. at 3–10, Dkt. 17. Kimberly further argues that the ALJ cannot discount Dr. Card's records, but then also accept some of his findings. Id. at 10. Kimberly also argues that even though her mood abnormalities were not noted by Dr. Card,

Dr. Card's focus was on her physical health, not her mental health. Pl.'s Br. at 11, Dkt. 17. The Commissioner counters that the ALJ "properly evaluated the opinion evidence, and he was not required to defer to any particular medical opinion when formulating Plaintiff's RFC." Def.'s Br. at 14, Dkt. 19.

Kimberly also argues that the ALJ erred in his consideration of Ms. Watty's opinions and should not have rejected Ms. Watty's conclusions about Kimberly's ability to work. Specifically, Kimberly argues that the ALJ discounts her symptoms of social anxiety and isolation, and certain symptoms that would prohibit success with completing complex tasks. Pl.'s Br. at 11, Dkt. 17. Like with Dr. Card's opinion, the Commissioner counters that the ALJ properly considered all evidence and was not required to defer to Ms. Watty's medical opinions. Def.'s Br. at 14, Dkt. 19.

Kimberly submitted her application in August 2019, thus, 20 C.F.R. §§ 404.1520c governs how the ALJ considered the medical opinions here.[5] When making an RFC assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide, however, that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimants' medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. Id. "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's

---

[5] 20 C.F.R. §§ 401.1520c, 416.920c applies to claims filed on or after March 27, 2017. For claims filed before this date, the rules in § 404.1527 apply.

supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; see also 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization, and other factors such as an understanding of the disability program's policies and evidentiary requirements. Id.[6]

Here, the ALJ properly considered Dr. Card's opinions under the new regulations. The ALJ discussed Dr. Card's opinions and provided specific reasons why he found none of them persuasive. Regarding Dr. Card's January 25, 2021 opinions that Kimberly could sit less than two hours and stand/walk less than two hours in an eight-hour, could occasionally lift/carry 10 pounds, and would miss work more than four days a month, the ALJ noted that these opinions were not persuasive. R. 31. The ALJ reasoned that Dr. Card's records did not indicate musculoskeletal abnormalities, reduced strength, or intense, chronic pain and that Dr. Card's records do not indicate that Kimberly "would miss much work if that work was limited in exertion." Id. The ALJ further reasoned that Kimberly's right knee would not limit her sitting. Id.

Kimberly argues that "the ALJ mischaracterizes the record in suggesting that most of Dr. Card's records failed to demonstrate musculoskeletal abnormalities." Pl.'s Br. at 6, Dkt. 17. The ALJ extensively discussed Kimberly's medical records, including her pain and diagnoses. While the record reflects that Kimberly suffers from several ailments that cause pain in her extremities,

---

[6] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well–supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3).

10

the record also reflects that Kimberly had a steady gait, had normal strength in her arms and legs, and experienced some pain but did not experience intense, chronic pain. R. 470–71, 473–74, 479–80, 482–83, 719–20, 725 26, 900. Kimberly's pain also improved with physical therapy. R. 815, 889. Although Kimberly had a documented abnormal or antalgic gait at some appointments with her physical therapist, the ALJ noted that "[t]hough her physical therapist had recurring notes of 'severe antalgic gait' (B16F), she had a steady gait in primary care provider visits during this period of later 2020 and in 2021." R. 29–30. The ALJ acknowledged that Kimberly had physical impairments, such as obesity, right knee degeneration, arthritis, edema, neuropathy, and asthma, that would limit her exertional abilities. R. 30–31. The ALJ also considered Dr. McGuffin's and Dr. Hutcheson's recommendations that Kimberly could complete work at the light exertional level and did not find those opinions persuasive because of Kimberly's pain and degeneration in her knees, as documented in the record, that would limit her standing/walking. R. 31. The ALJ instead imposed more limited restrictions than those suggested by the state agency physicians, to accommodate the limitations arising from Kimberly's physical impairments. Thus, the ALJ appropriately considered Dr. Card's opinions and provided a sufficient explanation for his determination that the opinions were not fully supported by and consistent with Kimberly's treatment records.

      The ALJ also properly considered Ms. Watty's opinions under the new regulations. The ALJ discussed Ms. Watty's opinions and provided specific reasons why he found them to be unpersuasive. Regarding Ms. Watty's March 2021 opinion that Kimberly had marked or extreme limitations in every category of work-related activities, the ALJ noted that Ms. Watty's "great limitations are not supported by her records and they are not consistent with the other records, particularly the primary care provider records." R. 32.

11

Kimberly argues that her "mood abnormalities, noted regularly by her mental health care providers, are discounted because the office notes of her primary care provider do not address any mood abnormalities, even though both practitioners were seeing [Kimberly] during the same period and Dr. Card's office was primarily concerned with treating [Kimberly]'s physical symptoms." Pl.'s Br. at 11, Dkt. 17. The regulations provide that the ALJ must consider the supportability and consistency of Ms. Watty's opinions. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Here, the ALJ appropriately noted an inconsistency in the assessment of Kimberly's mental health in her treatment records. R. 32. Specifically, Dr. Card consistently gave Kimberly normal mental health notations, while Kimberly reported to Ms. Watty that she had anxiety, depression, and isolation. R. 372, 528.

The ALJ also noted a lack of supportability to Ms. Watty's opinions. R. 32. Although Ms. Watty repeatedly found that Kimberly had no illogical thinking, delusions, or panic attacks during sessions, and that Kimberly's mental issues were not debilitating, Ms. Watty determined that Kimberly had marked or extreme mental limitations. R. 329, 417, 477, 508, 531, 621, 703, 720, 825, 895–96. The ALJ concluded that "Ms. Watty's great limitations are not supported by her records." R. 32.

The ALJ also considered Dr. McGuffin's and Dr. Hutcheson's recommendations that Kimberly's mental issues were non-severe and did not find these opinions persuasive because Kimberly "had significant findings in some mental health visits, including racing thoughts and pressured speech" that would make it difficult for her to concentrate on complex work. R. 32. Thus, the ALJ did not simply discount Kimberly's mental health impairments, but considered the opinions in the record, explained which opinions he found persuasive and why, and provided limitations in the RFC to accommodate those impairments.

The ALJ adequately explained why he found the opinions not persuasive, and I will not reweigh the evidence. The RFC assessment lies squarely with the ALJ, not with any medical provider or examiner. 20 C.F.R. §§ 404.1546(c), 416.946(c); see Felton-Miller v. Astrue, 459 F. App'x 226, 230-231 (4th Cir. 2011) ("The ALJ was not required to obtain an expert medical opinion as to [the] RFC."). To this end, when conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the Court defers to the ALJ's decision. Shinaberry v. Saul, 952 F.3d 113, 123 (4th Cir. 2020).

### C. Function-by-Function Analysis

Kimberly argues that the ALJ's opinion "fails to adequately explain the specific functional limitations assigned to [her] for purposes of [her] RFC or otherwise indicate that a proper function-by-function analysis was performed." Pl.'s Br. at 12, Dkt. 17. In support, Kimberly notes that the ALJ did not find any of the medical opinions persuasive. Id. Kimberly also states that the ALJ did not explain why he concluded that Kimberly could reach, handle, and finger frequently and how a limitation to simple, routine tasks addressed Kimberly's moderate limitation in understanding, remembering, or applying information, and in concentrating, persisting, or maintaining pace. Id. at 13. Kimberly argues that "[t]he ALJ was required to provide a meaningful explanation as to why he concluded that Plaintiff could perform specific functions given the contradictory evidence in the record from [Kimberly], the treatment records, and the medical opinions." Id. at 13–14.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-

13

8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Kimberly's medical records, the medical opinions, and the ALJ's

conclusions. The ALJ explains how the limitations in the RFC correlate with Kimberly's severe impairments. Specifically acknowledging Kimberly's obesity, right knee degeneration, arthritis, back pain from lumbar degeneration, neuropathy, edema, and asthma, the ALJ notes that the sedentary levels of exertion and standing/walking accommodate these issues. R. 30–31. Further, the ALJ found that while Kimberly's medical records reflect that she experienced pain, the record does not indicate intense, chronic pain that would be greatly limiting. R. 30.

As far as Kimberly's mental conditions, the ALJ acknowledged that Kimberly has certain limitations like distraction and loss of pace with complex tasks, but that Kimberly can focus on simple tasks. R. 25, 31–32. Kimberly argues that the ALJ "does not explain why [Kimberly]'s symptoms would need to rise to the level of delusion in order to prevent her from being able to maintain sufficient focus and concentration to complete simple tasks." Pl.'s Br. at 11, Dkt. 17. However, Kimberly misrepresents the ALJ's conclusion. The ALJ explained that Kimberly's ability to perform simple tasks would not be impeded because she does not have illogical thinking *or* delusions. R. 31–32. The ALJ also explained that Kimberly's presentation of rapid or pressured speech, racing thoughts, tangential speech, and tearfulness "would indicate she would have distraction and loss of pace with complex tasks, as such tasks would require thinking and focus." R. 31. Here, the ALJ met his burden by providing specific medical facts and non-medical evidence that supported his conclusion by evaluating the limitations Kimberly's mental impairments have on her concentration, persistence, and pace.

The ALJ also concluded that Kimberly should have no public interaction requirements, can have occasional interaction with co-workers, and should have an ordinary level of supervision. R. 25. The ALJ reasoned that Kimberly did not report panic during her visits with Ms. Watty and that Kimberly's primary care providers did not document mood abnormalities.

15

R. 32. Kimberly argues that "the ALJ does not explain how a relatively brief office visit with a familiar medical practitioner was equivalent to working a full workday and workweek alongside co-workers and subject to criticism and direction from supervisors." Pl.'s Br. at 11, Dkt. 17. As discussed above, the ALJ adequately supported his opinion by noting the inconsistencies in the treatment records between Kimberly's primary care providers and Ms. Watty. R. 372, 528. The ALJ also did not disregard Kimberly's social anxiety and his conclusion that Kimberly could have limited interaction with the public, co-workers, and supervisors, is supported by his review of the record.

Kimberly argues that the ALJ's opinion should be scrutinized because he found none of the medical opinions to be persuasive. "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p. The ALJ considered all the medical opinions and was not obligated to adopt any opinion wholesale. "[T]he decision not to rely on a single medical opinion does not invalidate the RFC." Smith v. Berryhill,, No. 3:17-CV-00506-FDW, 2018 WL 3447187, at *9 (W.D.N.C. July 17, 2018) (internal quotations omitted); see also Ellis v. Comm'r, No. 2:20-CV-74-M, 2022 WL 1127114, at *3 (E.D.N.C. Jan. 31, 2022), report and recommendation adopted sub nom. Ellis v. Kijakazi, No. 2:20-CV-00074-M, 2022 WL 990373 (E.D.N.C. Mar. 31, 2022) ("There is no requirement that an RFC be based on or mimic a medical opinion. Rather, the ALJ's job is to review and consider the record in its totality and articulate an RFC in compliance with the regulations."); Caldwell v. Comm'r, No. 5:21-CV-00094-RJC, 2022 WL 3974269, at *7 (W.D.N.C. Aug. 31, 2022) ("The regulations, as well as longstanding precedent, make clear that an ALJ is not required to rely exclusively on medical opinions, or on any one medical opinion, when creating an RFC."). The ALJ did not

16

ignore any evidence, and to the contrary, carefully and meticulously reviewed the evidence and provided an extensive medical history and evaluation of each source of treatment information. The role of this court is not to reweigh the evidence, as Kimberly urges, or substitute its judgment for the ALJ, but instead determine whether the ALJ's decision is supported by substantial evidence. See Hays, 907 F.2d at 1456.

Accordingly, I recommend finding that substantial evidence supports the ALJ's RFC determination.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  February 8, 2023

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge